## In the Matter of The CARE AND TREATMENT OF James PATE, Appellant.

### No. ED 82719.

Missouri Court of Appeals, Eastern District, Division Five.

June 29, 2004.

Emmett D. Queener, Columbia, MO, for Appellant.

David F. Barrett, Jefferson City, MO, for Respondent.

GEORGE W. DRAPER III, Judge.

James Pate (hereinafter, "Pate") appeals from the trial court's judgment entered following a jury verdict finding him to be a sexually violent predator (hereinafter, "SVP") and committing him to the custody and care of the Department of Mental Health pursuant to Sections 632.480–.513 RSMo (2000).[1] Pate raises two points on appeal. First, Pate argues the trial court abused its discretion in admitting testimony regarding his diagnosis in that this diagnosis failed to distinguish a condition that specifically predisposed a person to commit a sexually violent offense from a person who engages in criminal or unacceptable conduct. Second, Pate claims there was insufficient evidence to support a finding beyond a reasonable doubt that he suffers from a mental abnormality. We affirm.

Viewing the evidence in the light most favorable to the verdict, the facts adduced at trial are as follows: Pate's first sexually violent offense occurred in February 1977. Pate, along with five companions, chased a sixteen year old girl down the street, and Pate hit her with a stick. One of Pate's companions stole items from the girl and the others held her down while Pate sexually assaulted her. Afterwards, the men threw rocks at her and laughed at her. Pate pleaded guilty to assault with intent to ravish in November 1977 and was sentenced to three years probation on a suspended imposition of sentence.

In February 1981, Pate was accused of allegedly forcing a nineteen year old woman to the ground in a vacant lot by knifepoint. Pate attempted to undress her but stopped when bright lights appeared from nearby. Pate fled the scene. Pate was arrested, but the charges were dropped eventually.

Pate's next sexually related charge was in January 1986. Pate was accused of allegedly abducting a teenage girl from the street at knifepoint, then flourishing a gun. Pate led the girl to a vacant garage where he instructed her to lie on the floor. The girl refused, and Pate opened the front of her pants and touched her vagina. When Pate began to undress himself, the girl fled. Pate was charged with third degree sexual abuse, but the complaint was dismissed.

Pate pleaded guilty to rape of his girlfriend's eight year old daughter in September 1988. Pate assumed responsibility for his girlfriend's children while she was in substance abuse rehabilitation. Pate admitted he used drugs that evening when he took the child into the bedroom he shared with her mother, undressed her, and attempted to rape her. Pate attempted penetration several times; then he took the child into a bathroom where he masturbated in front of her. Pate gave the child one dollar and told her not to tell anyone. The child informed her mother the next day of the incident.

Pate was sentenced to serve thirteen years. Pate had a few minor conduct violations while incarcerated. After serving approximately nine years of his sentence and completing the Missouri Sex Offender Program, he was released on parole in February 1998, despite being described as "a high risk to re-offend."

As a condition of parole, Pate was directed to attend sex offender treatment in the community. Pate encountered substance abuse problems almost immediately upon release. Subsequently, Pate was arrested for the alleged forcible rape of an acquaintance, but the charges were dropped. In addition to this arrest, Pate violated his parole several times by failing

1. All statutory references are to RSMo (2000) unless otherwise indicated.

to complete sex offender training, traveling out of state without permission, and failing to report to his parole officer. Pate's parole was revoked in June 1999, and he was returned to the Department of Corrections.

Pate was scheduled for release in March 2001. In January 2001, the Department of Corrections informed the Attorney General's office that Pate might meet the definition of a SVP pursuant to Section 632.483.1. The State filed a petition per Section 632.486 to keep Pate in custody for an evaluation to determine whether he is a SVP and to eventually commit him to a secure facility in the Department of Mental Health.

In March 2001, the probate court found probable cause to believe Pate was a SVP and ordered him to undergo an evaluation to determine whether he fit that statutory definition. Dr. Richard Scott (hereinafter, "Dr.Scott") conducted this evaluation. Dr. Scott interviewed Pate and reviewed a number of documents with respect to his personal, educational, medical, and criminal history.

During the interview, Pate indicated the only problem area he needed to work on was the sexual activity with the child because he could not understand or explain why it happened. Pate dismissed the other sexually related charges and convictions because in his view, these acts were related to drinking and his belief that the women that asked him out wanted to have sex with him. Pate did not view himself as a sexual predator because he "didn't jump out of the bushes and rape women."

Dr. Scott diagnosed Pate with narcissistic personality disorder with antisocial features. Dr. Scott testified this disorder qualified as a mental abnormality within the meaning of the SVP statutes. In his opinion, Pate's disorder manifested itself in "a well-established pattern of sexual aggression, especially when [Pate] feels slighted or misled by a woman or feels he is owed sex from a woman." Dr. Scott emphasized Pate's explanation of his behavior confirms his lack of empathy for his victims and an unwillingness to accept responsibility for his actions. Dr. Scott opined this condition affected Pate's emotional capacity such that it predisposes him to commit sexually violent offenses. Dr. Scott concluded by finding this disorder made him more likely than not to engage in predatory acts of sexual violence if not confined in a secure facility.

Dr. Delaney Dean (hereinafter, "Dr. Dean") testified on Pate's behalf. Dr. Dean also interviewed Pate and reviewed substantially the same records as Dr. Scott. Dr. Dean administered three personality tests on Pate. Dr. Dean explored several possible diagnoses, including narcissistic personality disorder, pedophilia, sexual sadism, antisocial personality disorder, substance abuse/dependence, and psychopathy. Dr. Dean testified the test results indicated Pate had no mental abnormality other than substance dependence and personality traits consistent with dependent personality disorder. Moreover, Dr. Dean opined the results "tend to rule out the types of psychopathology and personality factors that would generally predispose a person to violent, aggressive, or predatory sexual behavior."

Despite finding no mental abnormality present, Dr. Dean rendered an opinion with respect to Pate's risk of re-offending. Using a risk assessment tool which evaluated twenty different factors, Dr. Dean found Pate displayed only six factors, many of which Dr. Dean gave little weight. In her opinion, Pate was not more likely than not to commit a sexually violent offense if not confined to a secure facility.

At the conclusion of all of the evidence, the jury returned a verdict finding Pate met the statutory definition of a SVP. The probate court ordered Pate committed to the Department of Mental Health for control, care, and treatment until his mental abnormality has so changed that is he safe to be at large. Pate appeals.

█ Pate's first point on appeal argues the trial court abused its discretion in admitting evidence that he suffered from narcissistic personality disorder with antisocial features. Pate claims the admission of this evidence violated his due process rights in that evidence of a personality disorder cannot satisfy the statutory requirement of a mental abnormality.

Pate filed a motion in limine seeking to exclude the State from making any mention of Pate's diagnosis because he argued it did not fit the statutory definition of a mental abnormality. The trial court denied Pate's motion at a pre-trial hearing. At trial, Pate made no objection to Dr. Scott's testimony with respect to his diagnosis. Pate raised this error in his motion for new trial.

The trial court's ruling on a motion in limine is interlocutory and subject to change during the course of the trial. *State v. Cole*, 71 S.W.3d 163, 175 (Mo. banc 2002). Moreover, a motion in limine to exclude evidence does not preserve the issue for review if no objection is made at trial when the evidence is offered. *State ex rel. MacLaughlin v. Treon*, 926 S.W.2d 13, 15 (Mo.App. W.D.1996); *Hancock v. Shook*, 100 S.W.3d 786, 802 (Mo. banc 2003).

A review of the transcript shows Pate failed to object at any point during Dr. Scott's testimony with respect to his diagnosis of Pate's personality disorder. As such, this point is not preserved for appeal. Pate's first point is denied.

Pate's second point, which is related to his first, claims the trial court erred in committing him to secure confinement in that there was insufficient evidence to support the jury's verdict finding him to be a SVP. Pate argues the jury only heard evidence that he suffered from a personality disorder, which did not meet the statutory definition of a "mental abnormality." As such, Pate believes the existence of a personality disorder alone is "too imprecise of a category" to establish the presence of a congenital or acquired condition affecting his emotional or volitional capacity in such a way as to predispose him to commit sexually violent offenses.

Since we use the same evidentiary standards for the commitment of SVPs as we use for criminal cases, when reviewing the sufficiency of the evidence we must determine whether the evidence presented to the jury was sufficient for a reasonable juror to have believed beyond a reasonable doubt that Pate is a SVP. *In re Care and Treatment of Amonette*, 98 S.W.3d 593, 600 (Mo.App. E.D.2003). We view the evidence in the light most favorable to the jury verdict, disregarding all contrary evidence and inferences. *In re Care and Treatment of Cokes*, 107 S.W.3d 317, 321 (Mo.App. W.D.2003). Conversely, we will not give the State the benefit of unreasonable, speculative, or forced inferences; nor will we supply missing evidence. *Id.*

The State must prove beyond a reasonable doubt that Pate meets the statutory definition of a SVP. *In the Care and Treatment of Coffel*, 117 S.W.3d 116, 121 (Mo. App. E.D.2003). Section 632.480(5) defines a SVP as "any person who suffers from a mental abnormality which makes the person more likely than not to engage in predatory acts of sexual violence if not confined in a secure facility" and, as in Pate's case, has pleaded guilty to a sexually violent offense.

Pate does not dispute the evidence supports a finding that he suffers from narcissistic personality disorder with antisocial features. Rather, Pate frames his argument in terms of whether this diagnosis is sufficient to rise to the level of a mental abnormality as required under the SVP laws. Pate urges us to recognize a distinction between mental conditions creating a specific danger of sexual offending and those resulting in generally criminal or unacceptable behavior. Moreover, Pate puts forth the rationale that because the phrase "personality disorder" is not encompassed in the SVP statutes, the legislature meant to exclude those disorders from the category of "mental abnormality."

■ This question is one of statutory construction, which is strictly a matter of law. *Lincoln Industrial, Inc. v. Director of Revenue*, 51 S.W.3d 462, 464 (Mo. banc 2001). The primary rule of statutory construction is to ascertain the intent of the legislature from the language used, to give effect to that intent if possible, and to consider the words used in their plain and ordinary meaning. *Lewis v. Gibbons*, 80 S.W.3d 461, 465 (Mo. banc 2002). "The construction of statutes is not to be hypertechnical, but instead is to be reasonable and logical and [to] give meaning to the statutes." *Id.* (internal quotations omitted).

We begin by looking at the statutory definition of mental abnormality. Section 632.480(3) defines a mental abnormality as "a congenital or acquired condition affecting the emotional or volitional capacity which predisposes the person to commit sexually violent offenses in a degree that causes the individual serious difficulty in controlling his [or her] behavior." *Id.; In re the Care and Treatment of Thomas*, 74 S.W.3d 789, 792 (Mo. banc 2002). We agree that the words personality disorder

do not appear in the statute. This does not end our inquiry, as we must read the language provided in the definition in such a way as to give meaning to each part.

■ First, we look to see if Pate's personality disorder qualifies as a "a congenital or acquired condition." Dr. Scott testified Pate suffered from an acquired condition, narcissistic personality disorder with antisocial features. Dr. Scott's report states this disorder is diagnosed when an individual demonstrates an "ongoing pattern of grandiosity, need for admiration and lack of empathy that is present by early adulthood." This diagnosis meets the definition of "an acquired condition."

■ Second, we look to see if there is evidence presented that the acquired condition affects "the emotional or volitional capacity which would predispose the person to commit sexually violent offenses." Dr. Scott's testimony presented ample evidence that Pate's narcissistic personality disorder affected his emotional capacity such that it predisposed him to commit sexually violent offenses. Dr. Scott testified this disorder manifested itself through a pattern of sexual aggression targeted at women when Pate feels as though a women has mistreated him. Moreover, Pate failed to exhibit any victim empathy or take any responsibility for his behavior, frequently rationalizing bad behavior during the evaluation. Dr. Scott also noted Pate did not have a relapse prevention plan nor did he seem motivated to manage his behavior in such a way as to reduce his likelihood of manipulating others for his personal gratification.

■ Finally, we look to see if this personality disorder "causes the individual serious difficulty in controlling his behavior." Here, Dr. Scott testified Pate had extreme difficulty in controlling his behav-

ior as a result of his personality disorder. Dr. Scott referenced his frequent arrests for both sexual and nonsexual offenses, and his ongoing substance abuse problems. Dr. Scott stated Pate's disorder qualified as a mental abnormality.

Based on Dr. Scott's testimony in this particular case, we find Pate's personality disorder met the statutory definition of a "mental abnormality." Additionally, Dr. Scott's testimony constituted sufficient evidence for a reasonable juror to have believed beyond a reasonable doubt that Pate is a SVP. Pate's second point is denied.

The trial court's judgment of civil commitment is affirmed.

SHERRI B. SULLIVAN, C.J., and GLENN A. NORTON, J., concur.