In the Matter of The Care and Treatment of Jamin SHAFER, Respondent–Appellant.

No. 26431.

Missouri Court of Appeals,
Southern District,
Division One.

Sept. 14, 2005.

Emmett D. Queener, Columbia, for appellant.

Jeremiah W.(Jay) Nixon, Atty. General, Sarah G. Madden, Asst. Atty. General, Jefferson City, for respondent.

NANCY STEFFEN RAHMEYER, Judge.

Jamin Shafer ("Appellant") was convicted of rape with armed criminal action in 1995; the victim was a 17 year-old woman. While serving his eight-year sentence for the rape conviction, Appellant participated three times in the Missouri Sexual Offender Program (MOSOP). MOSOP is cognitive behavior therapy which requires the participation of a group of sexual offenders. If members of the group do not believe the statement of one of the partici-

pants, the members will challenge that participant until he shares truthfully. Twice, Appellant failed to complete the program.

On November 3, 1998, Appellant received notice that he must successfully complete the MOSOP, or he would be subject to commitment as a sexually violent predator (SVP). Appellant began his third attempt at MOSOP and managed to complete it. During this last attempt at MOSOP, Appellant admitted to his therapist and other participants that he had raped five girls from the time he was sixteen until the age of eighteen. Prior to his release, Mr. Hoeflein, a licensed professional counselor working for the Missouri Department of Corrections, conducted an end of confinement evaluation on Appellant. During this evaluation, Appellant again admitted the five rapes. Hoeflein admitted at trial that he found it "rather odd" that Appellant would have withheld this information on the five rapes in his first two attempts at MOSOP and through most of the third. Upon request, Mr. Hoeflein re-interviewed Appellant three days after the first interview in order to confirm the report of these five rapes. Appellant again admitted the five rapes to Hoeflein. Appellant subsequently recanted on his admission that he had committed five rapes.

Prior to Appellant completing his sentence in the Department of Corrections, on May 17, 1999, the State filed a petition seeking to have Appellant committed as a SVP. The jury found Appellant to be a SVP. Appellant appealed that decision, and the judgment was reversed and remanded due to an improper jury instruction. *In re Care and Treatment of Shafer*, 100 S.W.3d 819, 820 (Mo. banc 2003). The case was retried in 2004, and in April 2004, Appellant was committed as a SVP.

At trial, the State introduced the testimony of Dr. Terry Davis, a Nebraska psychiatrist, who evaluated Appellant and based his opinions on "a couple thousand pages of records," because Appellant declined a face-to-face evaluation with Dr. Davis. Over the objections of Appellant, Dr. Davis testified that Appellant suffered from antisocial personality disorder (APD). A diagnosis of APD must include evidence of a conduct disorder at or around the age of fifteen, and this evidence can include aggression, property damage, deceitfulness, thefts, or serious violations of rules; Dr. Davis testified that he had found such evidence in Appellant. Dr. Davis listed the facts in Appellant's history supporting this evidence: reports of physical fights, both in and away from school; a juvenile court charge for either maliciously killing or injuring a dog when he was 17; a history of dishonesty before and during treatment; incidents of stealing; and probation violations when he was 16. He testified a diagnosis of APD served as a "mental abnormality" under Missouri's SVP law, section 632.480(2).[1]

Dr. Davis testified that Appellant's APD predisposed him to commit sexual violence because of his history of sexual assaults. At the same time, Dr. Davis stated that without the existence of the five rapes Appellant would not meet the definition of a SVP, although he would probably still be diagnosed as having APD. In terms of Appellant's dangerousness and likelihood of re-offending, Dr. Davis testified, "those five rapes are key [to] predicting what his future behavior would be." In other words, his opinion regarding Appellant's ability to control his behavior was based on the five rapes. Dr. Davis claimed Appellant was likely to re-offend and pointed to several factors: (1) the number of sexual

---

1. All references to statutes are to RSMo 2000, unless otherwise specified.

offenses or convictions; (2) whether the victims were strangers; (3) the presence of APD; and (4) Appellant's lack of success during treatment.

Although Appellant had since recanted his admission of the five rapes and Dr. Davis acknowledged the recantation, he still considered Appellant's admission of the five rapes reliable because, in his words:

> It's my opinion, and my experience has been that individuals with an antisocial personality will deny things that they have done, but they generally don't admit to things they haven't done.... It is unlikely, in my opinion, that he would admit to these if they didn't, in fact, occur.

At the same time, Dr. Davis also testified:

> It is somewhat difficult to get a real accurate picture of [Appellant's] history. Frankly, the reason being that he says he—he lies all the time, essentially all the time, from age—well, starting as a child, on, he has said that he lies. He has given numerous stories about various aspects of his history. So it's difficult to tell exactly what's accurate or what's not.

Ultimately, Dr. Davis stated at trial that Appellant suffered from APD, a mental abnormality under section 632.480(2), this mental abnormality predisposed Appellant to commit sexual violence, and that because of this abnormality and predisposition, Appellant has serious difficulty controlling his behavior.

In the first Point Relied On, Appellant argues that the probate court abused its discretion in admitting evidence that Appellant suffers from APD because a diagnosis of APD cannot satisfy the statutory requirement of a "mental abnormality" as it fails to distinguish a condition predisposing a person to commit a sexually violent offense from a personality disposed to criminal conduct in general. He argues that the definition of mental abnormality, which is detailed in section 632.480(2), defines mental abnormality as "a congenital or acquired condition affecting the emotional or volitional capacity which predisposes the person to commit sexually violent offenses in a degree constituting such person a menace to the health and safety of others."

■ The analysis concerning whether a personality disorder can serve as a mental abnormality is set forth in *In re Care and Treatment of Pate*, 137 S.W.3d 492 (Mo. App. E.D.2004). "First, we look to see if [Appellant's] personality disorder qualifies as a[sic] 'a congenital or acquired condition.'" *Id.* at 497. APD qualifies as an acquired condition. Next, the acquired condition must affect the emotional or volitional capacity which would predispose the person to commit sexually violent crimes. *Id.; see also In re Care and Treatment of Burgess*, 147 S.W.3d 822, 831–32 (Mo.App. S.D.2004) (stating that in terms of a mental abnormality under the sexually violent predator statute in Missouri, "... part of [the] consideration is whether a relationship exists between a particular disorder and the sexual offenses committed by the alleged sexually violent predator.")

In fact, Appellant concedes that APD can be a mental abnormality under section 632.480(2) if coupled with a sexual component, which would make him dangerous as a sexual offender. Because of this concession, Appellant, for all intents and purpose, has abandoned his First Point Relied On. What he is actually contending is the expert testimony regarding the sexual component of Appellant's disorder was not reliable; consequently, without this testimony, the State cannot show that Appellant is a sexual predator under section 632.480. The remaining argument

and cases in this point support Appellant's belief that "[i]nvoluntary civil commitment of so-called sexual predators is only permissible when it commits a distinct group of criminals who present a very specific danger to the safety of others"; such commitments are "an aberration of the law, permissible in only very narrow circumstances." Appellant concludes:

> The probate court abused its discretion in admitting evidence that [Appellant] suffers APD. Because this was the only evidence establishing the element of a "mental abnormality" necessary for [Appellant's] commitment as a sexually violent predator, the judgment of the probate court committing [Appellant] to the custody of the DMH must be reversed and [Appellant] must be released.

■ Appellant does not even argue that the diagnosis of APD was in error. He misses the mark by combining his challenge to the evidence that he has an acquired condition, APD, with this claim that APD alone fails to distinguish a condition predisposing a person to commit a sexually violent offense from a condition predisposing a person to criminal conduct in general. Appellant's second Point Relied On argues that Dr. Davis, the State's expert, relied upon improper and unreliable evidence that Appellant had committed five rapes between the ages of sixteen and eighteen. Therefore, the actual arguments and concerns of Point I will be addressed in the discussion of his second Point Relied On. Appellant argues in his second point that the trial court abused its discretion in admitting the expert testimony of Dr. Davis because Dr. Davis relied on Appellant's admission of the five rapes, which Appellant contends are unreliable under section 490.065.3:

> The facts or data in a particular case upon which an expert bases an opinion

or inference may be those perceived by or made known to him at or before the hearing and must be of a type reasonably relied upon by experts in the field in forming opinions or inferences upon the subject and must be otherwise reasonably reliable.

In support of his argument, Appellant cites to *Goddard v. State*, 144 S.W.3d 848 (Mo.App. S.D.2004), which holds the trial judge must determine independently whether the facts and data are otherwise reasonably reliable according to the mandates of section 490.065.3. *Id.* at 854. Appellant contends the trial court erred in accepting the testimony of Dr. Davis because the facts upon which Dr. Davis based his testimony were not "otherwise reasonably reliable." Appellant believes that the admission was obviously unreliable because of the circumstances surrounding the admission: (1) he was twice terminated from the MOSOP for failing to adopt the principles and report honestly; (2) he was in a group which generally refuses to accept that a sex offender has committed only one crime; (3) he was given a stern warning from his therapist that he was not meeting expectations and was at risk of being terminated from the program; and (4) only after these previous failed attempts and a stern warning did Appellant report the other rapes, at which point he received positive feedback from the therapist and group.

In addition, Dr. Davis agreed it was reasonable to assume that Appellant's fear of being committed would increase his motivation to complete the program and he also agreed that it was certainly possible that Appellant would do whatever he thought was necessary to get through the program in his last opportunity. Appellant again points to Dr. Davis's testimony:

It is somewhat difficult to get a real accurate picture of [Appellant's] history. Frankly, the reason being that he says he—he lies all the time, essentially all the time, from age—well, starting as a child, on, he has said that he lies. He has given numerous stories about various aspects of his history. So it's difficult to tell exactly what's accurate or what's not.

Finally, Appellant cites to his own expert's testimony, which disputes the testimony of Dr. Davis.

Appellant has pointed to several factors, which cause one to question the veracity of Appellant's admission concerning the rapes and, consequently, the reliability of the State's testimony; however, the trial court is only mandated to exclude testimony in those cases where the source upon which the expert relies is so slight as to be fundamentally unsupported. *Goddard*, 144 S.W.3d at 854. Furthermore, a disagreement between experts does not require the exclusion of either expert. *Alcorn v. Union Pacific R.R. Co.*, 50 S.W.3d 226, 246 (Mo. banc 2001). Dr. Davis, while noting Appellant's tendency to lie, also stated:

> It's my opinion, and my experience has been that individuals with an antisocial personality will deny things that they have done, but they generally don't admit to things that they haven't done.... It is unlikely, in my opinion, that he would admit to these if they didn't, in fact, occur.

The weaknesses in Dr. Davis's testimony go only to the weight the testimony should have been given and not its admissibility. *See id.* ("Any weakness in the factual underpinnings of the expert's opinion or in the expert's knowledge goes to the weight that testimony should be given and not its admissibility.").

When abuse of discretion is raised, the reviewing court determines whether a trial court's ruling is clearly against the logic of the circumstances before the court and is so unreasonable and arbitrary that it shocks the sense of justice and indicates a lack of careful, deliberate consideration. *Nelson v. Waxman*, 9 S.W.3d 601, 604 (Mo. banc 2000). The trial court does not abuse its discretion if reasonable persons can differ as to the propriety of the trial court's action. *Hancock v. Shook*, 100 S.W.3d 786, 795 (Mo. banc 2003).

We do not find an abuse of discretion in the admission of the testimony of Dr. Davis. The jury was apprised of the recantation by Appellant and Dr. Davis was extensively cross-examined about the possible motives of Appellant to make such a claim. We cannot determine that Appellant's statements that he committed five rapes prior to his conviction are not reasonably reliable or would not be reasonably relied upon by experts in the field. Appellant's second point is denied.

The judgment is affirmed.

PREWITT, P.J., and PARRISH, J., concur.